IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF JENNIFER VORDERMANN,
Deceased, by TINA EBERT, as Personal Representative
and individually, and JEFF ELLINGSON,

                        Plaintiffs,                    OPINION AND ORDER

        v.                                              09-cv-443-wmc

CITY OF EDGERTON, COUNTY OF
ROCK, THOMAS KLUBERTANZ,
MICHAEL WILLIAMS, CHRISTIAN
CHILSON, TERRY MURPHY and
JOHN DOE #1,

                        Defendants.

Late Sunday, August 17, 2008 or in the early morning of Monday, August 18, Shaun Vordermann shot his wife Jennifer Vordermann in the back as she left their bedroom, killing her and then himself with a gun removed from the home by police roughly 24 hours before. Believing the police could and should have prevented Jennifer's murder, her mother, Tina Ebert,[1] in her capacity as the personal representative of Jennifer's estate and in her individual capacity, and Jennifer's father, Jeff Ellingson, brought this lawsuit against the City of Edgerton, the Chief of Police, and two police offers, alleging claims under 42 U.S.C. § 1983 and a wrongful death claim under

---

[1] Tina Ebert brought suit as Tina Pond, but has since changed her name. The caption of this case has been altered accordingly.

1

Wisconsin law.[2]  In response to defendants' motions for summary judgment, however, plaintiffs have failed to put forth material evidence which would allow a reasonable jury to find that: (1) the City acted with deliberate indifference in failing to train and/or implement policies concerning domestic abuse or that this failure was a proximate cause of Jennifer's death; (2) the officers created or increased the danger Jennifer faced, or that their actions "shocked the conscience"; and (3) the officers were under a ministerial duty to arrest Shaun, thereby piercing the City's immunity.  Absent this evidence, defendants are entitled to summary judgment.

UNDISPUTED FACTS[3]

Around 10:30 p.m. on Saturday, August 16, 2008, Jennifer Vordermann called 911 and told the dispatcher with the Rock County Communications Center that her husband Shaun Vordermann had a gun, that he was threatening to kill himself, and that he was upset because Jennifer was not answering her phone.  Jennifer wanted the police to check on Shaun's welfare.

City of Edgerton Police Officers Michael Williams and Christian Chilson responded to the call.  Officer Williams arrived first at the Vordermanns' residence, where he observed that Shaun had barricaded the front door and was doing something at the side door.  Officer Williams was concerned that he was trying to obstruct the side

---

[2] The plaintiffs have settled with the other defendants to this action, County of Rock and Terry Murphy.  (Dkt. #63.)

[3] The following facts are derived from the parties' proposed findings of facts viewed in a light most favorable to plaintiffs.

door, thereby barricading himself in the house.  Based on this, Officer Williams ordered Shaun out of the house at gunpoint.  Shaun was taken to the ground, handcuffed, searched, and placed in the back of Officer Chilson's squad car.

Officer Williams interviewed Shaun, learning that (1) there was a gun in the house, (2) Shaun was concerned Jennifer had left because they were having money problems, and (3) Shaun suspected Jennifer had an addiction problem.  Shaun also indicated that Jennifer had been gone for two days.  On Shaun's phone, the officers reviewed text messages to Jennifer and others, including such statements as "should I pull the trigger or you?" and "I'm just saying goodbye to all my friends."  Shaun also sent text messages to Jennifer and other family members threatening to burn Jennifer's belongings. Shaun explained to the officers that he sent these in an effort to get Jennifer to contact him.

Officer Williams entered the Vordermanns' home and located the gun in its case in a back corner of the basement, as well as ammunition, where Shaun had indicated they both would be.  While Shaun remained in Chilson's squad car, Officer Chilson called Jennifer and asked her to return home so that the officers could speak with her, review text messages, and have her take care of the dogs and a fire burning in the backyard.  During the phone conversation, Jennifer told Officer Chilson that Shaun had sent her several text messages in which Shaun was threatening to hurt himself with the gun.  Jennifer also told the police that she did not want to return home, though she eventually agreed to do so.

Jennifer arrived home about thirty minutes later.  The officers initially spoke with her outside the Vordermanns' home, with Shaun confined to Officer Chilson's car.  Officer Chilson also spoke with Jennifer inside the home.  Officer Chilson asked if Shaun had ever been violent with her or if she was afraid of him at that time.  Jennifer said that Shaun had not been violent with her in the past and that she was not afraid of him being violent with her now.  Jennifer reiterated that she was concerned for Shaun and wanted him to get help.[4]

Officer Williams gave Shaun's gun to Jennifer.  Jennifer asked the officer to keep the gun, but Williams refused because it was not evidence.  Williams told Jennifer that the gun was marital property, and therefore she could do with it what she pleased, including giving it to a family member or friend for safe keeping.  Jennifer placed Shaun's gun in the locked trunk of her car.  Jennifer also indicated that she would not be staying at the house that night.  There is a dispute over whether Shaun could have heard Jennifer's conversation with Williams, or seen her place the gun in the trunk, but for purposes of summary judgment the court will assume both were possible from where Shaun sat in the police car.

After speaking with Jennifer, the officers did not consider Jennifer to be a domestic abuse victim, and they did not consider Shaun's behavior toward Jennifer to be

---

[4] According to plaintiffs, Shaun's mother reviewed the call logs from Shaun's phone, which revealed that Shaun called Jennifer 178 times in the 48 hours before his death.  (Pls.' PFOF (dkt. #66) ¶ 80).)  Although Officers Williams and Chilson reviewed certain texts on Shaun's phone, there is no evidence in the record that they were aware of this volume of calls or their content.  Nor do plaintiffs dispute that Jennifer told the police that she had no fear for her own well being.  (Pls.' Responses to Defs.' PFOF (dkt. #67) 44.)

abusive.  At some point, however, the officers determined that Shaun's mental state was such that he should be evaluated for possible emergency detention under Wis. Stat. § 51.15.  After approximately an hour and a half at the Vordermann house, Officer Williams took Shaun to the Rock County Crisis Center for evaluation.

The parties dispute what was said to Jennifer regarding emergency detention and a 72-hour holding period.  Defendants contend that Officer Chilson explained that Shaun would be held for up to 72 hours if an emergency detention was initiated, but that Officer Williams told Jennifer that Shaun being held was only one possible result of a § 51.15 detention.  (Defs.' Reply to Pls.' Responses to Defs.' PFOF (dkt. #71) ¶¶ 48-49.)  Plaintiffs contend that Jennifer later told her mother and her cousin that the police advised she had 72 hours to get her belongings out of the house before Shaun would be released.  (*Id.*)

Around the time Officer Williams dropped Shaun off at the Rock County Crisis Center, Officer Williams called Jennifer.  In that conversation, Jennifer reiterated that she was not planning on staying at the house that night, and Officer Williams told her that was a good idea.  Despite this, Jennifer opted to stay at the house that night.  According to Jennifer's mother, this was because she had decided to leave Shaun, wanted to pack her belongings and believed Shaun would be detained for 72 hours.

At the Rock County Crisis Center, Shaun was seen by Terry Murphy, a crisis worker.  She rated Shaun as a low to medium suicide risk, a low homicidal risk, and not a risk to his wife.  After spending about an hour being evaluated, Shaun was released from the Crisis Center to his sister between 2:00 a.m. and 2:30 a.m. on August 17, 2008.

Terry Murphy called Officer Williams to inform him that Shaun was being released from the crisis center. Officer Williams did not call Jennifer to tell her about Shaun's release.

After spending the night at his sister's home in neighboring Milton, Wisconsin, Shaun returned home sometime between 8:00 a.m. and 9:00 a.m. on August 17. When Shaun arrived, Jennifer was on the phone with her mother. According to her mother, Jennifer expressed surprise by his arrival, but his visit to the home was brief. After an exchange with Jennifer, Shaun left with Jennifer's car. Jennifer continued to pack and declined her mother's repeated offers to come and pick her up.

Sometime during the evening of August 17 Shaun returned. Late that night or in the early hours of August 18, Shaun shot and killed Jennifer, then himself, using the same gun the officers had earlier removed from the Vordermanns' basement.

At the time of Jennifer's murder, (1) no Edgerton police officer had received formal domestic violence or domestic abuse training while a member of the Edgerton police force and (2) certain provisions required under Wis. Stat. § 968.075 to be contained in each law enforcement agency's domestic abuse policy were absent from the Edgerton Police Department's domestic abuse policy.

OPINION

Pursuant to 42 U.S.C. § 1983, plaintiffs sue Officers Williams and Chilson in their official capacity, alleging that their "actions created or increased the danger to Jennifer Vordermann that ultimately and proximately caused her death." (Am. Compl. (dkt. #20) ¶¶ 7-8 & p.19, ¶¶ 34, 36.) Plaintiffs also allege a claim pursuant to § 1983

against the City of Edgerton for failing to train the officers and promulgate proper domestic abuse policies and procedures.  (*Id.* at ¶ 38.)  In addition to these federal claims, plaintiffs allege a wrongful death action against the City of Edgerton under Wisconsin law.

## A.      Municipal Liability

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).  There must be a "link between a municipal policy or custom and the alleged constitutional violation."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  While plaintiffs structure their complaint as stating three, separate § 1983 claims  -- counts I and II against Officers Williams and Chilson, respectively, for increasing the danger Jennifer faced and count III against the City of Edgerton for failure to train -- these claims will be analyzed together because the officers are only being sued in their official capacity. [5]  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

To prevail, therefore, plaintiffs must present sufficient evidence to permit a reasonable juror to find that the officers' actions, which allegedly created or increased the danger causing Jennifer Vordermann's death, were due to the City of Edgerton's failure to train and/or adopt certain policies and procedures concerning domestic violence.  In

---

[5] Had plaintiffs sued the defendant police officers in their individual capacity, the court would have had to consider whether the officers' actions had violated Jennifer's clearly-established constitutional rights.  For the reasons discussed below, however, plaintiffs have failed to put forth material fact to allow a jury to make such a finding.

other words, there can be no liability for the City's alleged failures absent an officer's violation of Jennifer's constitutional rights (i.e., creating or increasing the danger Jennifer faced); nor can the officers (really the City) be liable in their official capacity for creating or increasing the danger Jennifer faced unless the cause was the lack of a necessary policy or practice. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

**B.    Failure to Train**

In *City of Canton,* the Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388.   Given the "deliberate indifference" requirement, "an allegation of 'failure to train' is available only in limited circumstances."  *Cornfield by Lewis v. Consol. High School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993); *see also Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997).

"The liability criteria for 'failure to train claims' are exceptionally stringent." *Hayden v. Grayson*, 134 F.3d 449, 456-57 (5th Cir. 1998).  In order to prevail on a claim that the City failed to train its police officers adequately on issues concerning domestic violence, plaintiffs must demonstrate that: (1) the training at issue was constitutionally deficient; (2) the failure to train was the result of deliberate indifference on the part of the policymaker; and (3) adequate training would have prevented injury.  *Canton*, 489 U.S. at 390-31.  Failure to train claims concerning domestic violence cases are commonly

dismissed at the summary judgment stage because of the absence of proof on the elements of deliberate indifference and causation.[6]

### 1.    Training deficiencies

To remain certified, police officers in Wisconsin must complete 24-hours of continuing education annually.  Wis. Stat. § 165.85(4)(bn).  Domestic abuse training, however, is not a topic mandated by the state as part of the annual recertification process.  The City of Edgerton's Police Department does not offer its own training specific to domestic abuse, nor did it offer such training around the time of Jennifer's murder.  Training related to domestic abuse is required as part of the preparatory program that officers receive at a police academy.  Wis. Stat. § 165.85(4)(b)(1d).

Plaintiffs fail to explain how the training offered at the police academy, or other more general annual training offered by the City of Edgerton's Police Department, is constitutionally deficient.  Plaintiffs' own expert Diane Wetendorf opines merely that the

---

[6] *See, e.g., O'Brien v. Maui County*, No. 00-16571, 2002 WL 1192768, at *2 (9th Cir. June 4, 2002) (affirming grant of summary judgment to County because plaintiff, a domestic violence victim, "has not shown that Maui County consciously or deliberately pursued a policy of inaction with respect to her constitutional rights"); *Eckert v. Town of Silverthorne*, No. 00-1030, 2001 WL 1152781, at *9 (10th Cir. July 9, 2001) (affirming grant of summary judgment to Town on failure to train theory because plaintiff failed to link failure to train to an injury of constitutional proportions); *Semple v. City of Moundsville*, 195 F.3d 708, 713 (4th Cir. 1999) (affirming district court's grant of summary judgment for § 1983 claim because plaintiff failed to demonstrate that the City's failure to train amounted to deliberate indifference and failed to establish a direct causal connection between specific deficiencies and specific injury); *Hayden*, 134 F.3d at 456-57 (affirming district court's order dismissing claim against town because plaintiff could not demonstrate that the town acted with deliberate indifference in failing to offer domestic violence training); *but see Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415, (2d Cir. 2009) (reversing district court's dismissal of § 1983 failure to train claim against Village where pattern of mishandling of domestic violence complaints suggested a fundamental flaw in the training program).

training officers receive at the police academy "may be inadequate" without identifying any specific deficiencies.  (Report of Diane Wetendorf, attached as Ex. J to Declaration of Brian Brophy ("Brophy Decl.") (dkt. #68) at 4.)  *See Semple v. City of Moundsville*, 195 F.3d 708, 714 (4th Cir. 1999) ("Although plaintiffs allege that the Moundsville Police Department's practice was to train officers improperly in the implementation of the official domestic violence policy, they do not point to any specific deficiency in police training.").

Similarly, pointing out domestic violence training that the City could have offered falls short of proof that the training actually offered was inadequate.  (*See* Report of Scott Lund, attached as Ex. K to Brophy Decl., at 13 (listing available training programs).)  Evidence as to what the City "*could have provided* to prevent this occurrence . . . is a far cry from proving the actual training was constitutionally deficient."  *Palmquist*, 111 F.3d at 1345 (emphasis in original).

The Seventh Circuit has also criticized judicial mandates for training beyond what is dictated by statute or individual police departments, especially where it imposes additional burdens on smaller municipalities like Edgerton:

> By creating a law requiring municipalities to exceed the standards for police training established by state law, not only would this court *exceed the scope of our judicial authority by usurping the policy-making authority of state legislators*, but we would also *impose upon smaller municipalities* such as Austin, the *untenable burden* of maintaining the same standards of law enforcement training specialization as those of large cities or even national armies. Even were it within the province of this court to establish such a policy, it seems neither wise nor practical.

*Ross v. Town of Austin, Indiana*, 343 F.3d 915, 918-19 (7th Cir. 2003) (emphasis added).

Plaintiffs have certainly made a case for the efficacy of domestic violence training, but absent evidence the City's training falls short of state law, or at least short of the accepted policy or practices of police forces with a similar demographic, plaintiffs have failed to set forth sufficient evidence for its claim of inadequate training to survive summary judgment.

## 2. Deliberate indifference

Plaintiffs must also demonstrate that the Police Department's failure to provide its officers with domestic violence training amounts to deliberate indifference. *See Canton,* 489 U.S. at 388. As the Seventh Circuit explained, "liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission [] is likely to result in constitutional violations." *Cornfield*, 991 F.2d at 1327. This "notice" requirement may arise in either of two circumstances.

> First, a municipality acts with deliberate indifference when, "in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy *so likely to result in the violation of constitutional rights*," that the deficiency exhibits deliberate indifference on the part of municipal policymakers. Alternatively, we may find deliberate indifference when a *repeated pattern* of constitutional violations makes "the need for further training . . . plainly obvious to the city policymakers."

*Jenkins,* 487 F.3d at 492 (quoting *Canton,* 489 U.S. at 390 & n.10) (internal citations omitted) (emphasis added).

As for the first circumstance -- an obvious need for and likely unconstitutional lack of training -- plaintiffs present evidence that domestic violence calls are a routine part of the duties of the City of Edgerton's police force. Chief Thomas Klubertanz testified that

11

responding to domestic violence situations was a significant part of his department's duties and something his officers did several times a week.  Officer Williams estimated that five of every 100 calls involve domestic relationships.  But the fact that domestic violence related calls is part of a City of Edgerton police officer's typical duties does not demonstrate that the training received at the police academy was inadequate or that a lack of ongoing training is "so likely to result in constitutional violations."

In *Ross,* the Seventh Circuit explained that the fact that officers "had dealt with armed felons in the past did not obligate [the Town] to anticipate the utility of hostage negotiation or tactical combat training.  In the context of a failure-to-train claim, deliberate indifference does not equate with a lack of strategic prescience." *Ross*, 343 F.3d at 918.  Similarly, here, the fact that the City police officer's typical duties include responding to domestic calls does not obligate training beyond what was received at the police academy or beyond what the officers may receive more generally as part of their annual certification process.

As for the second circumstance -- a repeated pattern of constitutional violations -- plaintiffs' expert points to three domestic homicides in Rock County in 2008, two of which were murder-suicides, which includes Jennifer's and Shaun's deaths.  Between 2000 and 2008, there were five domestic homicides in Rock County.  For the City of Edgerton, other than Jennifer and Shaun Vordermann, there have been no homicides in a domestic abuse situation in at least the past 20 years.  This data is not sufficient to establish a pattern of domestic homicides in the relevant universe, namely the City of Edgerton.  *Palmquist*, 111 F.3d at 1347 ("The single incident at issue in this case does not

make a lack of training so obvious, and any inadequacy therein so likely to result in the violation of constitutional rights, that the Village elders can reasonably be said to have been deliberately indifferent to a purported need.").

Even if these numbers suggested a pattern of domestic homicides, plaintiffs offer no evidence suggesting a pattern of constitutional violations -- situations where police somehow increased or created the danger faced by the victims of domestic abuse -- that would put the relevant policymakers on notice of the inadequacy of Edgerton Police Department's domestic violence related training.[7]

At most plaintiffs have demonstrated negligence on the part of the City in failing to implement a domestic abuse training program.  And the City acknowledges making efforts to revamp its training and policies concerning domestic abuse after this incident.  But proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence," *Jenkins*, 487 F.3d at 492 (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)), and the plaintiffs have failed to set forth sufficient facts for a reasonable trier of fact to find deliberate indifference in the face of a pattern of constitutional violations.

### 3.      Causation

Even if the evidence supported a finding of the City's obvious, deliberate indifference to specific training deficiencies, plaintiffs must also demonstrate that the

---

[7] Defendants also contend that the relevant "policymaker" is not the Chief of Police Thomas Klubertanz, as plaintiffs contend, but rather the City Council.  For reasons discussed above, this fact is not material to the outcome of defendants' summary judgment.

failure to train was the proximate cause of Jennifer's constitutional violations.  Causation hinges on demonstrating both that (1) there was a constitutional violation, and (2) the lack of training caused the constitutional violation.   In other words, even if Officers Williams' and Chilson's actions increased or created the danger she faced, plaintiffs must also demonstrate that the City's alleged failure to train the officers adequately caused these actions.  *See Uwomarogie v. Village of Glen Ellyn*, No. 06 C 2628, 2008 WL 2782833, at *7 (N.D. Ill. July 15, 2008) (requiring "more than a probability" that the failure to train caused the constitutional violation in order to prevail).

The City argues that Officers Williams and Chilson had no reason to believe that this was a domestic abuse situation.  This argument misses the mark.  Plaintiffs' claim is that if the officers had had the appropriate training, they would have identified certain "markers" of domestic abuse (*i.e.*, Jennifer's leaving and hiding out, Shaun's stalking of Jennifer, obsessive emails, his threatening to burn Jennifer's belongings, his relatively recent purchase of a gun, her discounting the likelihood of Shaun hurting her, etc.).  Plaintiffs' expert Diane Wetendorf explained in her report:

> Had the officers been trained to conduct a lethality assessment, they would have realized the seriousness of the situation.  Key indicators include: a separation or an attempt at separation; a display of obsessive behavior; access to/ownership of guns; suicidal ideations; plans, or attempts; depression; sleep disturbances; stalking of the victim; and prior police contact with the parties, all of which were present in this situation.

(Report of Diane Wetendorf, attached as Ex. J to Declaration of Brian Brophy ("Brophy Decl.") (dkt. #68) at 3.)[8]

Even acknowledging the importance of such "markers," any causal link between Jennifer's murder and the City of Edgerton's failure to provide specific training on domestic abuse seems strained on the specific facts of record here.  Plaintiffs' claim assumes that this undefined training would have changed the officers' evaluation of risk during or after their visit to the Vordermanns' home, which would have resulted in some action on their part to alter the course of events leading to Jennifer's murder.  Since the officers ultimately detained Shaun for evaluation for possible emergency detention by trained health care professionals, and it was they who made the formal lethality assessment, plaintiffs offer nothing to suggest that additional training could have or would have resulted in a different assessment.[9]

## C.    Failure to Implement Certain Policies

While the thrust of plaintiffs' argument concerns the City of Edgerton's failure to train, plaintiffs also allege that the City should be liable under § 1983 for failing to

---

[8] Plaintiffs cite to Wetendorf's report for her conclusions that if the officers had received more certain training, they would have recognized that all of these were "key indicators" for domestic violence.  Defendants contend that this is a fact which should have been included in plaintiffs' proposed findings of fact in order to be considered by the court. (*See* Defs.' Reply (dkt. #70) at 31 n.14.)  While defendants' point is valid, the court will still credit Wetendorf's conclusions.

[9] Plaintiffs' claim also presumes that Jennifer's rights under the due process clause of the Fourteenth Amendment were violated by the officers increasing or creating the danger she faced, which the court addresses in Part D below.

implement (1) a domestic abuse policy which reflects current state law, and (2) a policy concerning notification of domestic abuse victims when the abuser is released from a Wis. Stat. § 51.15 evaluation. *See Harris v. City of Marion, Indiana*, 79 F.3d 56, 58 (7th Cir. 1996) ("[T]he failure to select or implement necessary practices can constitute a 'policy or custom' for purposes of *Monell* § 1983 suit, if that failure causes a constitutional violation.").

With respect to the domestic abuse policy, plaintiffs offer evidence that the Police Department's domestic abuse policy at the time of Jennifer's death did not contain several provisions mandated by state law, but they provide no link between the absence of certain provisions in the policy and a constitutional violation. Specifically, plaintiffs offer no explanation as to how the differences between Edgerton's 2008 policy and state law impacted the events of August 16-18, 2008. Accordingly, plaintiffs have failed to demonstrate that the City of Edgerton's outdated domestic abuse policy materially contributed to Jennifer's murder.

Moreover, Chief Klubertanz testified that as of the date of Jennifer's murder, he was unaware that the domestic abuse policy was out of date. This undisputed fact undermines any finding of deliberate indifference, which is premised on actual or constructive notice. *See Harris*, 79 F.3d at 59 ("In addition, the municipality's inaction must amount to deliberate indifference, so that it is fair to infer that the inaction is itself a 'policy.'").

Plaintiffs have a stronger argument with respect to the lack of policy concerning notification of domestic abuse victims, which at least arguably would have prevented

defendants' failure to contact Jennifer and inform her that Shaun had been released, rather than held for a 72-hour period. But this, too, is lacking a credible, proximate cause of Jennifer's death, since it is undisputed she had *actual notice* of Shaun's release the morning of August 17, 2008, when he returned briefly to the Vordermanns' home. If Shaun had murdered Jennifer upon his return to the home that morning, rather than quickly leaving and returning later that night or in the early morning of August 18, 2008, then the lack of notification might arguably have contributed to her death. Shaun's return to the Vordermanns' home, however, provided Jennifer with actual notice of his release and it was her decision to stay in the home anyway, not reliance on a 72-hour holding period, that ultimately resulted in her still being in the home when Shaun returned, at least twelve hours later. Admittedly, Shaun's sudden appearance and his apparently abrupt taking of her car, may have contributed to Jennifer's tragic decision to remain in the home, but this is too speculative a link for a trier of fact to find a causal chain between the officers' lack of notification and Jennifer's murder.[10] Even if this were not too speculative a link, there is again *no* evidence that the City's failure to adopt a specific notice policy amounted to deliberate indifference.

## D.    Creating or Increasing Danger

"The Due Process Clause of the Fourteenth Amendment places a limitation on the state's power to act; however, it generally does not impose upon the state a duty to

---

[10] Plaintiffs' claim that Jennifer relied upon the officers' express assurance that Shaun would be arrested and held for 72 hours also appears based on the inadmissible hearsay testimony of Jennifer's mother, Tina Ebert, and a cousin. (*See infra* discussion pp.21-22.)

protect individuals from harm by private actors." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).   There are two exceptions to this, the second of which is relevant to this case.   "[T]he so-called state-created danger exception provides that 'liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'" *Id.* (quoting *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)).   "Although [the Seventh Circuit] acknowledged in *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982), that the state's placement of an individual in harm's way can result in actionable constitutional claims, cases in which [the court has] either found or suggested that liability attaches under the 'state-created danger' exception are rare and often egregious." *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003).

In order to prove that Officers Williams and Chilson created or increased the danger Jennifer faced, plaintiffs must demonstrate: (1) that the officers created or increased the danger faced by Jennifer by "affirmative acts"; (2) that the failure to protect Jennifer was the proximate cause of her death; and (3) that the state's failure to protect "shock[s] the conscience." *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817-18 (7th Cir. 2007).

Plaintiffs' "state-created danger" claims are premised on three alleged "actions" on the part of Officers Williams and Chilson: (1) asking or requiring Jennifer to return to the Vordermanns' home, which the plaintiffs characterize as forcing her out of hiding; (2) failing to take the gun into police possession; and (3) failing to inform Jennifer of Shaun's release from the Rock County Crisis Center, after erroneously informing Jennifer

18

that Shaun would either be: (a) placed under arrest and required to avoid the Vordermanns' home for 72 hours after the arrest pursuant to Wis. Stat. § 968.075(5), or (b) held for observation under Wis. Stat. § 51.15 for up to 72 hours.

*First*, plaintiffs contend that Officers Williams and Chilson forced Jennifer out of hiding by asking her to return to the Vordermanns' home, thereby increasing or creating the danger she faced.  In *Losinski v. County of Trempealeau*, 946 F.2d 544 (7th Cir. 1991), the Seventh Circuit affirmed the district court's grant of summary judgment to the defendants, rejecting a failure to protect claim, where the police officers escorted an abused wife with a TRO against her husband to their home to pick up some items. While there and with the deputy sheriffs present, the husband shot and killed his wife. The Seventh Circuit found that:

> the state did not subject Julie involuntarily to an existing danger.  Although the state walked with Julie as she approached the 'lion's den,' it did not force her to proceed.  It did not encourage her to continue.  And once the group arrived at the house on September 13, it did not require her to stay.

*Id.* at 550.

While *Losinski* also involved a domestic homicide, the facts in this case are different.  Here, plaintiffs allege that it was the defendant officers who led (even coerced) Jennifer to the "lion's den," though fact issues remain as to whether Jennifer was really "hiding" during her two-day absence from the Vordermanns' home and whether she intended to return absent the police officers' request for her to do so.  Even so, plaintiffs have arguably offered just enough facts for a reasonable trier of fact to conclude that the officers increased the danger Jennifer faced by persuading her to return.

19

Unfortunately for plaintiffs, they must also demonstrate that the officers' actions proximately caused Jennifer injury and that the officers' actions "shock the conscience." Given that Jennifer had at least 12 hours "hiding" after actual notice of Shaun's release, it is highly suspect to claim the officer's actions were the proximate cause of her death. In any event, the officers' reasons for requesting that Jennifer return to the Vordermanns' home -- namely to speak with her about Shaun, review text messages, and have her deal with the dogs and fire in the backyard -- are sufficient to bar a reasonable trier of fact from finding their actions "shock the conscience."[11]

*Second*, plaintiffs also argue that the officers' failure to take possession of the gun and ammunition used to murder Jennifer also increased or created the danger that she faced. In response, the City contends that the officer's refusal to take possession of the gun constitutes inaction, not action, and cannot be a basis for finding liability. In *Windle v. City of Marion, Indiana*, 321 F.3d 658, 662 (7th Cir. 2003), the Court rejected plaintiff's attempts to characterize the defendant's "inaction as an affirmative choice," and to premise claims on that inaction. Similarly, here, the officers' decision not to take the gun constitutes inaction and cannot form a basis for finding that the officers increased or created the danger Jennifer faced.

---

[11] The facts here contrast sharply from the Seventh Circuit's decision in *Reed v. Gerdner*, 986 F.2d 1122 (7th Cir 1993), where the court denied defendants' summary judgment motion, finding that the officers' actions shocked the conscience. In *Reed*, the officers arrested the driver of a car and left an intoxicated passenger in the car, thereby creating "the dangerous condition [of] a drunk driver on the road." *Id.* at 1126.

Removing the gun from its position in the basement, however, could constitute an affirmative act.  It is questionable whether this action increased the danger Jennifer faced since the gun was already located in the Vordermanns' home and it was Shaun who informed the officers of its location.  Even if this act -- removing the gun from the basement -- increased the danger Jennifer faced, it too does not "shock the conscience." The officers placed the gun with Jennifer and encouraged her to give it to a friend or family member for safe-keeping.  At that time, the officers believed Jennifer's own statements that she was not a victim of domestic abuse and that she did not fear for her own safety, but rather for Shaun's.  They also believed that Shaun had not been abusive toward Jennifer.  Under these circumstances, however ill-advised with hindsight, the officers' actions do not shock the conscience.

*Third*, plaintiffs contend that defendants' "false promise" that Shaun would not be able to return to the Vordermanns' home for 72 hours, his subsequent release, and the defendants' failure to inform Jennifer of his release also increased or create the danger Jennifer faced.  These alleged actions also fail to form a basis for finding that the officers violated Jennifer's constitutional rights by increasing or creating the danger that she faced.

As an initial matter, defendants contend that plaintiffs cannot rely on double hearsay testimony -- namely, what Jennifer told her mother and cousin the officers told her about Shaun being held for 72 hours -- in opposing summary judgment.  (*See* Defs.' Reply Br. at 3 (citing Pls.' Responses to Defs.' PFOF (dkt. #67) ¶¶ 48-50, 59-60, 62, 63).)  Defendants also rely on other out-of-court statements made by Jennifer in their

21

summary judgment materials.  (*See* Defs.' PFOF (dkt. #53) ¶ 50 ("Jennifer asked the officers"), ¶ 60 ("Jennifer had previously told Officer Williams"), ¶ 62 ("Jennifer reiterated to Officer Williams").)  Were Jennifer still with us to testify statements made to her by the officers would be admissible as statements by a party-opponent under Fed. R. Evid. 801(d)(2), but she is not, and the court sees no grounds for their admission for the truth of the matter asserted.  Though plaintiffs cite no support for this position, Jennifer's statements may be admissible for other reasons, namely as proof of Jennifer's state of mind and as an excited utterance when Jennifer expressed surprise at Shaun's return to her mother in a phone conversation.  At this stage, the court is, therefore, unwilling to outright exclude Jennifer's statements from consideration, though without admissible testimony contradicting what the officers actually said there is little left to consider.

Even if the court were to credit what plaintiffs allege was said to Jennifer regarding a 72-hour holding period for purposes of summary judgment, plaintiffs' claim would still be lacking, since Shaun's brief visit to the Vordermanns' home the morning of his release again breaks any causal chain between the officers' alleged statements increasing the danger Jennifer faced and her constitutional violation.  As already discussed, Shaun's visit to the Vordermanns' home the morning of August 17, 2008 provided Jennifer with actual notice of his release and, therefore, the officers alleged statements that he would be held for 72-hours and their failure to inform Jennifer of his release cannot form the basis for liability.  After Jennifer was actually aware of Shaun's release, she had the opportunity at that time to leave, but she chose to stay the rest of that day and into the evening,

apparently packing her belongings.  As her mother testified, Jennifer did not sound or appear fearful of Shaun, rather she was confident of her decision to leave him. Tragically, just as were the officers and the mental health officials, Jennifer was mistaken.


E.     **State Wrongful Death Claim**[12]

Plaintiffs also bring a state claim for wrongful death against the City.  (Am. Compl. (dkt. #20) ¶¶ 39-41.)  Plaintiffs contend that Officer Williams and Officer Chilson acted negligently and in violation of their ministerial duties by failing to arrest Shaun pursuant to Wis. Stat. § 968.075, which provides for mandatory arrest when a person has committed domestic abuse.

---

[12] Because defendants are entitled to summary judgment on plaintiffs' § 1983 claims, the court's usual practice would be to dismiss plaintiff's state law claims without prejudice to be refiled in state court.  This practice is consistent with "the well-established law of this circuit." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("The usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  *See also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction.").  A court may, however, depart from "usual practice" and continue to exercise supplemental jurisdiction if the circumstances weigh in favor of such action.  For example, there is no reason to send back to state court "'doomed litigation' that will only be dismissed once it gets there" for lack of merit.  *Groce*, 193 F.3d at 502.  In such circumstances, the district court retains supplemental jurisdiction "because it invades no state interest–on the contrary, it spares overburdened state courts additional work that they do not want or need–for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts." *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) (internal quotation omitted).  Because plaintiffs' state law wrongful death claim here is clearly without merit and the court and the parties have already invested ample time with the facts relating to that claim, this court retains supplemental jurisdiction, and grants summary judgment to defendants on the wrongful death claim as well.

Defendants contend that the City and its employees are immune from liability under Wis. Stat. § 893.80(4) for "any act that involves the exercise of discretion and judgment." *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 21, 253 Wis. 2d 323, 646 N.W. 2d 314. A ministerial duty, in contrast to an act which involves discretion and judgment, is a duty that is:

> absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.

*Lister v. Bd. of Regents of Univ. Wis. Sys.*, 72 Wis. 2d 282, 301, 240 N.W.2d 610, 622 (1976).

Wisconsin law mandates that a law enforcement officer "arrest and take a person into custody if":

> 1. The officer has reasonable grounds to believe that *the person is committing or has committed domestic abuse and* that *the person's actions constitute the commission of a crime*; *and*
>
> 2. Any of the following apply:
>
> a. The officer has a reasonable basis for believing that *continued domestic abuse against the alleged victim is likely*.
>
> b. There is evidence of physical injury to the alleged victim.
>
> c. The person is the predominant aggressor.

Wis. Stat. § 968.075(2) (emphasis added).

"Domestic abuse" is defined as:

> (a) "Domestic abuse" means any of the following engaged in by an adult person against his or her spouse or former spouse, against an adult with whom the person resides or formerly

24

resided or against an adult with whom the person has a child in common:

1. Intentional infliction of physical pain, physical injury or illness.

2. Intentional impairment of physical condition.

3. A violation of s. 940.225(1), (2) or (3) [sexual assault].

4. *A physical act that may cause the other person reasonably to fear imminent engagement in the conduct described under subd. 1, 2 or 3.*

Wis. Stat. § 968.075(1)(a) (emphasis added).

While § 968.075 mandates an arrest in certain domestic abuse situations, officers still must exercise their discretion and judgment in determining whether the factors required for arrest exist. Plaintiffs' principal expert on domestic abuse policies testified that the standard for mandatory arrest was not met, but that perhaps a discretionary arrest should have been made.  (Deposition of Diane Wetendorf, attached as Ex. G to Declaration of Meg Vergeront ("Vergeront Decl.") (dkt. #54) at 22:7-19.)  Further, plaintiffs' other expert, the Chief of Police for the Village of Combined Locks, Wisconsin, testified at his deposition that while he believed Shaun should have been arrested, other people could disagree with his finding that the definition of "domestic abuse" in subsection (1)(a)(4) was met. (Deposition of Scott Lund, attached as Ex. N to Vergeront Decl. at 63-64.)[13]  Whether or not the officers made the right call, reasonable people

---

[13] Plaintiffs also contend that the "known-danger" exception to municipal immunity applies.  (Pls.' Br. (dkt. #64) 34 (citing *Lodl*, 2002 WI 71 at ¶ 38).)  But the known danger exception also involves the exercise of a ministerial duty, one that is not imposed by law, but rather by "particularly hazardous circumstances -- circumstances that are both known to the municipality or its officers and sufficiently dangerous to require an explicit, non-discretionary municipal response."  *Lodl*, 2002 WI 71 at ¶ 39.  Outside of the factors in determining whether Shaun's arrest was warranted under Wis. Stat. §

would have to concede the officers were not mandated to find "domestic abuse" under (1)(a)(4) at the time, given (1) the absence of *any* history of domestic abuse, and (2) Jennifer's own repeated statements, as well as her actions, that she was concerned with Shaun's safety, not her own.

ORDER

IT IS ORDERED that:

1)  defendants' motion for summary judgment (dkt. #51) is GRANTED;

2)  defendants' motion in limine to exclude evidence regarding hedonic or loss of life damages is denied as moot; and

3)  the Clerk of Court enter final judgment for defendants and close this case.

Entered this 22nd day of September, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

968.075, there are no other "dangerous circumstances" for the officers to consider and, therefore, the "known-danger" exception does not apply for the same reasons that the officers' duties could not be deemed ministerial under Wis. Stat. § 893.80(4).